**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

*FILED*

AUG 15 2017

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **PLAINTIFF** | ) | **CAUSE NO. _____** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DEPAUW UNIVERSITY, JANE ROE,** | ) | **1:17**-cv-**2790** *RLY* -DML |
| **ALAN HILL,  AND JULIANN** | ) | |
| **SMITH,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John Doe ("Plaintiff" or "John")[1],  by and through his undersigned attorney, files

this complaint and, and support thereof, alleges as follows:

### NATURE OF THIS ACTION

1.      This is an action for declaratory and injunctive relief and for damages arising out

of a decision by defendant DePauw University ("the University"), finding John responsible for

various violations of the University's Sexual Misconduct and Interpersonal Violence Policy and

Process, updated September 2016 (the "Policy") and to suspend John from enrollment at the

University for a period of two (2) years, all as a result of alleged and unproven accusations of

sexual misconduct made by fellow University student, defendant Jane Roe ("Defendant Roe"). [2]

---

[1]     John is contemporaneously filing a Motion for Permission to Proceed Under Pseudonym. John is
entitled to proceed anonymously because of the highly sensitive nature of the disciplinary proceedings
against him that form the basis for his Complaint, and the fact that the University is fully aware of his
identity and will not be prejudiced in any way.

[2]     John also seeks to maintain the privacy rights of Defendant Roe by requesting permission to identify
her anonymously as "Jane Roe."



1

2.      This case arises out of Defendant Roe's false accusations against John and the subsequent actions taken and procedures employed by Defendant DePauw University ("the University") concerning Defendant Roe's false allegations against John of nonconsensual sexual activity with a fellow student from the University, Jane Roe.

3.      John, a male student at the University who has a documented severe Expressive and Receptive Learning Disability (Severe Dyslexia), seeks relief against Defendant Roe for defamation of character, and against the University and the other defendants for wrongful and discriminatory actions during the investigation of the claims against him, an erroneous finding of culpability, and the unjustified imposition of an unjustified and onerous sanction of two-years' suspension.

4.      The procedural errors committed by the University in the Investigation are too numerous to include in this introductory statement, but include, among other things, the following:

    a.  failing to provide disability services to John during the initial interview during which the University took advantage of John's severe language in obtaining a false confession;

    b.  continuing their failure to provide disability services to John throughout the investigation of the case;

    c.  failing to be severe language disability-informed when evaluating any and all of John's oral and written communications;

    d.  using unfamiliar and confusing nomenclature in the interview, like "nonconsensual sexual intercourse" (a term that does not appear in the

Policy or in the initial email notice) instead of using the unmistakable word "rape" creating significant likelihood of confusion, especially for a severely dyslexic student under extreme pressure;

e.  failing to provide a concise summary of the allegations against him at the initial interview as required by the Policy and refusing to do so after numerous requests for a statement of the specific conduct at issue; failing to thoroughly investigate the claims and adequately assess the veracity of Defendant Roe and her witnesses;

f.  Improperly reopening the Investigation after the investigative period had closed to help Defendant Roe by asking leading, "clarifying" questions in attempt to produce possible evidence not theretofore in the case file but necessary to manipulate the preponderance of the evidence and find John culpable in the case;

g.  using the principles of a "trauma-informed approach" (a sensitive awareness of the possibility of traume used in communicating with a person who is alleging trauma in case the allegations are true so as to not further traumatize possible victim) and Defendant Roe's unsubstantiated claim that she was traumatized to wholly disregard exculpatory evidence and the testimony of the only witness who saw the two intimately sleeping together, all without expert psychological, medical or other evidence;

h.  failing to interview witnesses identified by both parties during the investigation which could have provided exculpatory evidence;

    i.   failing to adequately investigate Defendant Roe's violations and manipulation of the terms of the no contact directive put in place at John's request or his retaliation claim against Defendant Roe;

    j.   completely dismissing as irrelevant new evidence presented by John during the appeal that Defendant Roe had  (i) asked an exculpatory witness not to testify, (ii) had lied to the prosecuting administrators about why she "needed" to stay in John's room on the night in question, and (iii) had lied to the prosecuting administrators about her work-study obligations in violation the John's no-contact directive;

    k.   failing to notify the person deciding the sanctions that the no-contact directive was issued at John's request, not Defendant Roe's.

5.    These injustices were all the direct of Defendant Roe's false accusations and the University's (1) discriminating against John under the Title IX of The Americans with Disabilities Act of 1990, 42 U.S.C. § 2000 and Title II, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 ("ADA and Section 504") by failing to determine and implement appropriate measures to facilitate John's full and equal participation in the investigative process from the attorney's interview of John which resulted in statements that were deemed a confession and thereafter, (2) failing to follow the express provisions of the Policy in investigating the false allegations against John, (3) failing to administer the Policy that would protect John's constitutional and statutory rights as required by the [**2001 DCL -** *U.S. **Dep**'t Of Education Office of Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students By*

***School Employees, Other Students, or Third Parties* (Jan. 2001)]** (4) imposing an unduly harsh and disproportionate sanction.

6.      John has a documented severe expressive and receptive learning disability of which the University is fully aware and has been aware since prior to John's enrollment in the University.  The University was further made aware of John's severe learning disability from the beginning of the investigation as acknowledged by the University in Defendant Hill's August 11, 2017, decision to sustain the Determination of Responsibility entered on June 20th, 2017 (the "DOR") and the Determination of Sanctions (the "DOS") and deny John's request that both the DOR and the DOS be reversed in the entireties.

7.      Having knowledge of John's severe learning disability prior to and during the investigation of the Title IX allegations, the University was obligated under the Americans with Disabilities Act and by official guidance from the Department of education's office for civil rights to take certain affirmative steps to protect John. It did not. Instead the University proceeded to prosecute John without providing him the disability services required to assure his full and complete participation and understanding of the process at all times. the University's investigation and appeal procedures were rife with procedural flaws, lack of due process and specific bias against John as an accused student.

8.      It is possible that the university is grossly unfair, biased, and inappropriate investigation and sanctioning in this particular case a rows from its institutional response to intense public scrutiny, multiple federal investigations brought on by female students nationwide accusing universities of failing to address incidents of campus sexual assault and sexual harassment against women, and specifically in response to the  Result in the  2014 King v.

5

DePauw University decision handed down by US District Court for the Southern District of Indiana, Terre Haute Division. As a result of the King decision, the University amended its policy, removing some protections for accused students making it easier for them to prosecute claims of sexual misconduct to the detriment of falsely accused students such as John, purportedly in an effort to comply with the 2011 "Dear Colleague Letter" issued by Department of Education's Office for Civil Rights ("OCR") which provides guidance to schools on how to handle claims of sexual misconduct under Title IX.

9.      There are a number of cases currently pending in federal court to the nation in which accused students, after having been found culpable by their universities of sexual misconduct, seek judicial relief. On Friday August 12th, the US Department of Education filed a motion in Title IX false accusation case, asking the U.S. District Court for the District of Columbia, Case No. 1:16-cv-01158 (RC), asking the Court to put that case on hold for ninety (90) while the Department of Education reviews the OCR's guidance provided in the 2011 Dear Colleague Letter that is being challenged in such cases and In that motion, the Department stated:

"14.      In light of the change in administrations, the Department of Education's Office for Civil Rights is reviewing the 2011 Dear Colleague Letter challenged in this case. As a step in this ongoing review, Secretary of Education DeVos convened stakeholders, including students, families, and educational institutions, on July 13 to discuss the Department's Title IX policies. Defendants, including the Secretary, have been engaged in ongoing discussions with students, parents, educational institutions, advocacy groups, and experts to learn about their experiences and to hear their views of how the Department can best fulfill its obligations under Title IX.

15.      Accordingly, if the Court determines that holding this action in abeyance while Defendants are reviewing the 2011 Dear Colleague Letter will promote judicial economy, Defendants respectfully request that the Court grant this Motion and hold the

6

action in abeyance Case 1:16-cv-01158-RC Document 30 Filed 08/11/17 Page 3 of 4 4
for 90 days while the Department of Education's Office for Civil Rights reviews the 2011
Dear Colleague Letter that is challenged in this litigation."

10.     The most egregious and onerous of the University's actions was the complete and

utter trampling of John's rights as a severely learning disabled student, in obtaining a false

confession from John under the extreme duress of being "interviewed" by two authority figures,

one of whom was an attorney, on less that a day's notice.

11.     John has been extensively tested and diagnosed with a severe expressive and

receptive language disorder. It is a learning disability that affects the way his brain processes

language on both perception/input part of written and oral communication and the expressive/

output part of both written and oral communication. In other words, John's brain does not

process language the way the brains of non-disabled students do.

12.     This severe learning disability does not mean that John is less intelligent or

incapable of understanding complex concepts or communications or of expressing himself, but it

does cause John to take long pauses while he absorbs information and formulates a response.

13.     John's severe learning disability means it takes John much longer to understand

written and oral communications and to express himself. It also means that miscommunication

is very likely to happen when the context of the discussion is not very clear, particularly when

new nomenclature or changes of context are made, especially if those changes are subtle and

nuanced.

14.     John's severe learning disability makes it impossible for him to self-advocate,

particularly under extreme anxiety and stressful situation, such as the the Initial Interview and

defending himself against Defendant Roe's false accusations.

15. The OCR has noted in other matters that when a learning disability is so severe that a student cannot self-advocate, such as John's situation, simple academic accommodations such as a note-taker, more time to finish tests or books on audio will not suffice under such extreme anxiety-producing situations. In those cases, a university must adequately "engage [the student] in a deliberative, interactive process for determining what modifications are necessary for effective participation in the [process]."

16. Not only did the University fail to engage in a deliberative, interactive process for determining what modifications John might need prior to his initial interview during which they coerced a false confession, they exacerbated the problem by providing compounding the stress and anxiety, providing him less than 24 hours' notice before he had to appear before two Title IX administrators, one of whom was a attorney, and providing him the 20-page Policy document, along with the alarming statement statement that he had been accused of acts, without divulging what those acts were, which could constitute rape, sexual battery, sexual harassment, or non-consensual sexual contact. The extreme anxiety and pressure that such a meeting would cause any non-disabled student is obvious. Placing that kind of pressure on a student with a severe expressive and receptive language disability and expecting him to understand what is happening, self-advocate, and to initiate a deliberative, interactive process for determining what modifications he might need is unconscionable.

17. Learning disabilities have been shown to significantly increase the incidence of false confessions. "The courts are no longer restructured to admitting evidence where there is

mental illness or learning disability. Personality disorder is now judged as a potential psychological vulnerability relevant to the reliability of confession evidence.[3]

18.     "Even when no deliberate police misconduct has taken place, the use of the wrong words or phrases during the interrogation may be sufficient to have the confession excluded." (Gudjonsson, 281)

19.     After the initial interview, John notified his mother, who is incidentally an attorney, and told her for the first time of the false accusations and the Investigation and sought her help.  John wanted his mother to represent him as his attorney and to advocate for him, but that request was denied.

20.     John shortly filed a grievance with Defendant Hill stating that Defendant Smith and Wippich had violated his rights under the ADA and Section 504 and requesting that the false confession be expunged from the record.  In determining whether any discrimination had occurred, Defendant Hill consulted as his expert on learning disabilities, ADA and Section 504 Defendant Smith, the very attorney and Title IX administrator who discriminated against John during the initial interview, totally ignoring the obvious and serious conflict of interest of having the person who interviewed John and committed the ADA and Section 504 violations be the expert consulted to make the determination.  Not surprisingly, Defendant Smith stated that there were no violations.  She justified that decision by citing that John had not requested any accommodation during the interview despite the fact that the University has admitted that

---

[3] Gudjonsson, Gisli H. "The Psychology of Interrogations and Confessions: A Handbook." John Wiley & Sons, May 27, 2003. Web., p. 3.
https://books.google.com/books?id=GtB65IADRjIC&pg=PA325&lpg=PA325&dq=learning+disabi lity+interrogation&source=bl&ots=8496P1A9uQ&sig=e7kIEzy2ZAQmCKYmvb1-Q760yZQ&hl=en &sa=X&ved=0ahUKEwjk2oro-NTVAhUBTGMKHc8nB6YQ6AEIQTAE#v=onepage&q=learning%20 disability%20interrogation&f=false

Defendant Smith was on aware of John's disability at that time. Defendant Hill then denied the grievance on that basis.

21.     The fact that the the University's expert on disabilities for this case was so unaware or unconcerned about John's rights as to completely dismiss his learning disability, not once, but twice, first during the interview process and then again in advising Defendant Hill on the law, shows a gross disregard for the protection of disabled students rights and John's right in particular.

22.     The University's actions breached its implied contracts with John as a tuition-paying student who has foregone the opportunity to attend other universities based on the the University's implied contract obligations, the applicable standard of law under Indiana, and the requirements of the ADA and Section 504 and Title IX of The Education Amendments of 1972, 20 U.S.C. §1681 et seq. ("Title IX").

23.     The University's arbitrary and capricious actions, findings, and sanctions, if not enjoined by the Court, will derail John education, permanently damage his reputation and potentially continue to harm him the rest of his life.

## THE PARTIES

24.     John Doe is a natural person who resides in the state of Indiana. During the events described herein, John was enrolled as a full-time, tuition-paying, undergraduate student at the University.

25.     Defendant Roe is a natural person who resides in the state of Indiana.  Upon information and belief, during the events described herein, Defendant Roe was enrolled as an undergraduate student at the University.

26.     Upon information and belief, the University offers a number of undergraduate degree programs and is located in Greencastle, Putnam County, Indiana.

27.     Upon information and belief, Alan Hill is a resident of the State of Indiana and was the Vice President of the University University at all relevant times herein. He has been employed by the University since August 1, 2016 ("Defendant Hill").   Defendant Hill served as adjudicator of John Doe's ADA Grievance and of the John Doe's appeal of the Determination of Responsibility and Sanctions.

28.     Upon information and belief, Juliann "Juli" Smith is a resident of the State of Indiana and was the Title IX Administrator/Assistant to the Senior Advisor to the President on Diversity and Compliance for the University University all relevant times herein ("Defendant Smith"). Defendant Smith was selected by the University University to serve as Investigator and Decision Maker(?) for the matter concerning John Doe and Jane Doe only. Defendant Smith was also the University University's "most knowledgeable lawyer on ADA" that Defendant Hill referred to in the decision of a possible ADA violation.

### JURISDICTION

29.     This action is brought pursuant to the ADA and Section 504 and Title IX.

30.     This Court has original subject matter jurisdiction of the federal question presented pursuant to. 28 U.S.C. §§1331 and 1367.

31.     Venue is proper in this Court and Division, pursuant to 28 U.S.C. §1391, because the events giving rise to this action occurred in, and the defendant is a education institution domiciled in Greencastle, Putnam County, Indiana, which is located in the Indianapolis Division of the  Southern District of Indiana.

## FACTS COMMON TO ALL CLAIMS

**John's Relationship with Defendant Roe and the Night in Question**

32.    John and Defendant Roe became friends during their freshman year at the University.  Defendant Roe was often domineered and controlled John, referring to him frequently as "little bitch" even after he requested that she not do so.

33.    They had never had sex prior to the night in question, but their friendship included sexual conversations and lengthy direct discussions of having sex together and how that might affect their friendship.  One such discussion in September of 2016, ended with the two deciding it would not be a good idea and went their separate ways.  Later that day, Defendant Roe re-initiated the possibility of having sex by texting John saying cryptically, 'f--k it, let's do it".  John replied asking if she meant sex and she said she was agreeing to whatever he was asking.  John had not been asking and said he thought their earlier decision was right.

34.    Their discussions also included their various romantic relationships with others and other personal problems and situations.  Defendant Roe often confided in John about her sexual experiences with other men,  especially when she was insecure about them.   Indeed, just 8 days after the night in question, Defendant Roe told John that she planned to sleep with one of his fraternity brothers that very day. John has no knowledge of whether that happened or not.

35.    Defendant Roe slept in John's dorm room one night during freshman year, and had taken two naps in John's room in his fraternity house during sophomore year, both without John being present, and one of those times without his permission.  Defendant Roe has never spent the night in John's room at his fraternity, with or without John's presence.

36.     Upon information and belief, Defendant Roe has spent the night numerous times at John's fraternity with several other members of John's fraternity in their rooms, and has dated and been romantically involved with other members of John's fraternity.

37.     Upon information and belief, Defendant Roe has also spent the night at John's Fraternity in the cold dorm and has a bed in the cold dorm that she regularly utilizes. That bed is generally known those who are close to Defendant Roe to be her bunk.

38.     John and Defendant Roe both separately attended a party at John's fraternity on January 20, 2017. John spent most of the evening with two friends, Witness AB and Witness RH.

39.     John and Defendant Roe did not go to the party together, meet, hang out, or even talk until after 3:00 am when Defendant Roe initiated the following text conversation:

| | |
|---|---|
| Jane (3:12 am) | Make sure I go to bed with you |
| Jane (3:14 am) | [John]! |
| John (3:15 am) | Ah ok. Do you mean just like sleep? |
| Jane(3:15 am) | Yes! We both need just sleep |
| John (3:16 am) | Gotcha |
| Jane (3:16 am) | [John]! It's for the best! |
| John (3:16 am) | You right |
| Jane (3:16 am) | I know! |
| Jane (3:17 am) | I always am |
| John (3:21 am) | Chill |
| Jane (3:21 am) | Hey! I am behaving |
| John (3:22 am) | You right |
| Jane (3:25 am) | That's why I told you to make sure I behave |
| John (3:25 am) | Haha I'll look out |

40.     Shortly thereafter, Defendant Roe, interrupted John while he was with Witness RH and literally pulled him bodily by the arm, repeatedly saying "Let's go, [John], Let's go to bed together", and completely ignoring Witness RH's presence which she stated during the Title

IX investigation made her very uncomfortable and she worried the John might be in a "red dot" situation, *i.e.,* a predatory sexual situation, based on Defendant Roe's aggressive behavior.

41.    Defendant Roe and John left and went upstairs to John's room, and neither left the room thereafter until later in the day after the events in question.

42.    Shortly after John and defendant Roe went upstairs, witness RH told Witness AB that she was concerned about John given the aggressiveness of Defendant Roe. Witness AB went to John's room and knocked on the door.  When she received no answer, she texted John at 3:47 am  and asked if he was okay and was he sure he wanted to spend the night with Defendant Roe. John replied that he was okay.

43.    Once John and Defendant Roe were in John's room, John prepared for bed as he usually did, pulling out the gray futon he normally slept in and changing into his boxers.  John and Defendant Roe did not discuss where Defendant Roe should sleep but she laid down on the futon John opened, one he regularly sleeps on. John was lying on his side on the outside of the futon, with his back to Defendant Roe who was lying between the wall and John, "spooning" him from behind.

44.    When Witness AB's text came in, John quickly responded because by then he and Defendant Roe had starting talking about having sex.  Defendant Roe continued to spoon John, occasionally reaching over his shoulder to talk to him.  The discussion was disjointed and similar to the text conversation, with Defendant Roe oddly saying that that it was for the best that not have sex, even when John was thinking about how to respond and hadn't said anything yet.  He said each time that he did not think it would hurt their friendship and then they would cuddle.

Defendant Roe would then say something like "really think about it" or "it's for the best", "one of us might get hurt" and John would think about it and responded with reassurances.

45.     At no time did Defendant say that she did not want to have sex, only that it might hurt the friendship. John reassured her every time that he thought there would be no ill affect on their friendship. The two intermittently cuddled and made out and stopping to talk about whether they should go forward, then cuddling again their friendship with Defendant Roe saying it might not be a good idea and John taking some time to think about it and respond that he thought they had would be ok.

46.     John eventually kissed Defendant Roe on the neck. Defendant Roe moaned and passionately called John's name and the two began kissing in earnest. The two continued engaging in foreplay. Defendant Roe took off her on shirt and sports bra off and assisted John in taking her pants and underwear off. John took his own boxer shorts off.

47.     After both parties were naked and had engaged in foreplay for a time, John asked Defendant Roe if he should get a condom, and she indicated he should.

48.     John left the bed, walked to the other side of the room, obtained the condom and returned to the bed. During that time, Defendant Roe waited naked for him on the futon and neither left the room nor put her clothes back on. When later questioned by the University's Title IX about the why she did not leave or put her clothes on when John got up to get the condom, she stated that she thought John had changed his mind.

49.     The two engaged in passionate, mutually consensual sexual intercourse. John stated in his original interview and in every statement made in the investigation that he remembered that in her passion, Defendant Roe had used her hands to help guide John's penis

into her vagina.  John remembered that moment because it was such a passion, intimate, and arousing act that took their encounter from foreplay to intercourse.

50.     Post-coital, John put his boxers back on and offered to retrieve Defendant Roe's clothes, but she went John's dresser and got a t-shirt and shorts and wore those to sleep in.  The two slept cuddled together and were witnessed the next morning asleep with Defendant Roe's arm around John by his roommate, Witness LB.

51.     Later that day, Defendant Roe emailed John indicating she regretted their decision but assured him she was just mad at herself, and John indicated he was sorry as well.

52.     Defendant Roe left campus for a few days and apparently decided that she regretted it so much that she started accusing John of forcing her.

53.     In her statements, she said that she did not realize what happened was rape until her best friend at home told her it was.  The Title XI administrators did not ask the best friend's name or ask her to be a witness.  When John's advisor asked about it, Defendant Smith indicated it was not necessary.

54.     Defendant Roe sent John a text on January 24th that said "we need to talk."  John responded that he'd been think about that night too, and when asked why he was thinking about it, John responded that he had let his reptilian brain take over.  John's statement was made in the context of both his and Defendant Roe' regretting having been overcome with passion which was exactly what happened.

55.     All of the remaining texts between John and Defendant Roe consisting of her making statements that John read in the context of him having assured Defendant Roe that their friendship would not be affected and thinking his friend thought he should have "made sure [she]

16

behave[d]" as she said in her text that night.  John had no context to cause him to suspect that the words Defendant wrote in those texts were intended to imply that he had raped her or forced her to have sex.

56.     John did NOT commit rape or coercion or any other sexual misconduct and none of his texts were intended to confess to any of those things.  He was operating always from the context of his knowledge of what actually happened that night and Defendant Roe's statement that "what happened was not ok" and the she regretting their having had sex.  That context was never changed by anything that Defendant Roe said.

57.     John and Defendant Roe had a couple of face to face meetings, one of which took place in John's room, in which she told he was wrong, and that what he did was wrong.  At no time did she say to John that raped her.  She said he did not understand what consent was and that it was so important.  She indicated that if a female had ever expressed doubt or hesitancy during the encounter, then she didn't consent even if she actively participated.  As it turns out, that is exactly how the Defendant Smith interprets that Policy's definition of consent as shown by her findings of fact in the Determination of Responsibility..

58.     Defendant Roe continued after the night in question to come to John's fraternity, even playing beer pong in the hall outside John's door so that he had to squeeze by to get past her to enter and exit his room on one occasion.

59.     To John and his friends, Roe just said he was wrong, never saying she was forced or raped her and giving no details.  To her own friends and the president of John's fraternity, she said he raped her but gave not details.  Each of her witnesses stated the same thing, that all she

said was that John raped her.  To all of John's friends and witnesses, she said that had sex without her consent.

60.     From that point, Roe and her friends began to harass and threaten John.  Her friend, Witness RS isolated John in his room at the fraternity and badgered him for over an hour repeatedly saying he did not understand consent.

61.     Despite the harassment and vague accusations, Roe continued to send friendly texts with smiling and kissy emojis to John and to like his social media posts.  In fact, as recently as May 11th, Defendant Roe continued to "like" John's instagram posts.

62.     Likewise, all of their mutual friends that talked with both John and Defendant Roe about the night in question, *i.e.,* Witnesses, LB, IE, and Akil Davis, had been telling John from the outset that Defendant Roe was not accusing him of rape, only not getting consent for sexual contact.  Not understanding the difference and knowing that the encounter had been mutual, John simply tried to make his friend feel better since she so clearly regretted their encounter.

63.     Upon information information and belief, Defendant Roe told Witnesses LB and CK at first that she filed the Title IX claim only because she needed a break to deal with "other things".  Upon information and belief, she later told them that she was planning to withdraw her claim and would do so if John admitted he was wrong.

64.     Given his severe learning disability, never made the switch in context from Defendant Roe's regretting having had sex that night and wanting to punish him for being wrong about their friendship to her alleging it was rape.  That realization came months later after the first closing of the investigation when the parties were allowed to review the file.

18

**The Title IX Proceeding**

65.     On March 8, 2017, some 46 days after the night in question, Defendant Roe filed a complaint with the University's Title IX office.  Upon information, she was informed of her right to a No Contact Directive to prevent John from having contact with her, but she declined.

66.     Three days later, on March 14th, John received an email summoning him to the Title IX office the next day to meet with two Title IX administrators, one of which was an attorney, the next morning.

67.     John meet with Witnesses LB and IE, and non-witness Akil Davis, all of whom had talked with Defendant Roe about the situation.  All of them encouraged him to admit to "nonconsensual sexual contact" and he would get a minor sanction because that is how the the University system worked.  See Affidavit of Akil Davis attached hereto.

68.     On March 15th, John was interviewed Defendant Smith and Wippich.  He was not told what the allegations were, only that the alleged misconduct could be rape, sexual battery, sexual harassment, or nonconsensual sexual contact as stated in the email.

69.     No disability services were offered or encouraged by the Title IX Administrators. Nor were the questions designed to clarify the new nomenclature being used with John or to set specific context about the questions they were asking.

70.     Based on what he knew to be true about his and Defendant Roe's sexual encounter that evening and the information he had been told by Defendant Roe and Witness LB, he understood and believed he was being accused of nonconsensual sexual contact.

71.     John did not agree that he had committed non-consensual sexual contact, but had been advised that Defendant Roe would withdraw the allegations. He understood and believed

19

that Defendant Roe was alleging that what they did was wrong because it had damaged their friendship.

72.     The term "nonconsensual sexual <u>contact</u>" is the only Prohibited Conduct term used in the Policy that starts with the word "nonconsensual".  It is the least serious of all the sexual  misconduct listed in the Policy and means "[p]hysical contact of a sexual nature by one person against the will of or without the consent of another."  Policy, Section VII(1).

73.     During the initial interview, John gave a description of what happened that evening which included his telling Defendant Smith and Wippich that the sexual encounter was mutual and that Defendant Roe had mutually participated, had consented and agreed that he should get a condom, and thereafter assisted him in achieving penetration.

74.     Even with the extremely high anxiety and pressure of being questioned by defendant Smith, John said he felt very bad that Defendant Roe was so upset and that "what happened was wrong."  At no time did he say that he was wrong or what he did was wrong but that what happened was wrong.

75.     Despite John's statement that the encounter was mutual, Defendant Smith asked him the following question: "Let me ask you because you said a couple of times in the conversation here that you understood *what happened was wrong* (emphasis added) is it your understanding that [Defendant Roe] was not consenting to sex?" John responded by repeating the statements Defendant Roe had made to him, "Yes, and that is the problem it is that it was not an agreement and she kept reiterating that this was not a good idea I don't remember her saying no but she did say that she said she said no so I trust that's true."

76.     John's statement that there was "no agreement" referred to an express oral affirmative consent, i.e., neither of them asked the question "do you consent to have sex" so the question was not asked. Their actions in engaging in passionate sex was their agreement. And his word usage is wholly consistent with what he understood from the repeated lecturing from Defendant Roe and her friends that if she ever expressed hesitancy during the night, she could not consent. Had John had an advocate or at least an interviewer who understood and was sensitive to his disability and he had been given a concise summary of the conduct at issue as required, he would have understood they were talking about apples and oranges and the interview would have resulted in a more accurate reflection of what John knew to be true.

77.     In the heat of the Initial Interview it did not occur to John to express nor could he have expressed the depth and length of the discussion he and Defendant Roe had on the night in question. Nor were his language abilities sufficient to explain to defendant Smith when he said "what happened was wrong," he was referring to his having told Defendant Roe that he did not think there sexual encounter would harm their friendship. As is often true when a language disabled person is being questioned under pressure, his communicative skills shut down and he attempted to say what he thought he needed to say in order to end the questioning.

78.     Exacerbating John's confusion and inability to understand what he was being asked and to express himself during the Initial Interview, Defendant Smith used unfamiliar nomenclature in describing rape without setting a context or definiting the terms she was using that would have assured that John understood her meaning. Defendant Smith used the term "non-consensual sexual ¨intercourse" which is another term that means rape. That term never appears in the Policy and was not used in the email John received the night before stating the

possible types of misconduct he could be charged with.  It is however very similar to the least

egregious of the possible misconduct per the Policy, that is "non-consensual sexual contact."

79.     Unfortunately, because of his severe language disability, John did not understand

that there was the difference and did not know he was being accused of rape and was not infored

of the alleged  misconduct until much later in the proceedings and after he had made his oral

statement and written statement and the investigation was officially closed.

80.     Defendant Smith later, in a recorded statement made on March 24th, admitted that

they like to use the term non consensual sexual intercourse in these  situations instead of the

word "rape" because "rape" scares students.

81.     When John asked Defendant Smith at a meeting on March 24, 2017, exactly what

he was being accused of, she said, "well, ultimately rape." She immediately added in a tone

seemingly designed to lessen John's obvious anxiety at hearing the word rape "but it could be the

lesser included offenses such as rape, sexual battery, nonconsensual sexual contact, and sexual

harassment." John understood that clarifying caveat to mean he was not being accused of rape,

but the instead the lesser offense of nonconsensual sexual contact as he understood all along.

82.     Shortly after the Initial Interview, John filed an ADA grievance with Vice

President Alan Hill based on the administrators' violations of John's rights under ADA and

Section 504. the University does not have a qualified ADA expert on staff, so Hill consulted the

very same lawyer that conducted and the interview and not surprisingly she said it was not a

violation. The rationale was that John had not asked for accommodations, despite the fact that

the OCR has ruled that students with learning disabilities do not have to request accommodations

in such situations as their disability would preclude the wherewithal under such high pressure situations.

83.     John at no time believed that he was culpable of any Prohibited Conduct, but Defendant Roe and her friends had badgered and harassed after the night in question, saying that he did not understand "consent" and that "consent" is so important.  See John's Request for No-Contact Directive

84.     **[The policy provisions]** Defendant Smith with the help of Wippich, proceeded with the investigation, stating that it was in accordance with the Policy.  The provisions of the Policy most relevant to the Investigation and this Complaint are as follows:

  a.  Section III. Key Policy Definitions. Consent;

  b.  Section III. Key Policy Definitions. Title IX Administrators

  c.  Section V. Interim Measures. (introductory paragraphs)

  d.  Section V. Interim Measures. No Contact Directive;

  e.  Section VI. Rights of Students and Student Organizations (all);

  f.  Section VII. Prohibited Conduct (all);

  g.  Section VIII.  Statement on Consent and Incapacitation (all);

  h.   Section IX. Title IX Process Overview

  i.  Section X. Title IX Investigation and Resolution Process. Parts 2, 4, 7, 8, 9, 11, 13, 16, 17, and 19;

  j.  Section XI. Sanctions

  k.  Section XII. Appeals.

  l.  Section XIII. Communication of Outcomes

m. Section XV. Sexual Misconduct Process Records.

85.     "The University utilizes a single process model, which means that the title mine administrators are responsible for 1) evaluating the initial complaint to determine whether the contact could constitute a violation of the prohibited conduct; 2) if the reported contact, if true, would constitute a policy violation, conducting a fair and thorough investigation; 3) evaluating the facts gathered from the investigation; and 4) issuing findings of responsibility for the reported misconduct.

86.     Defendant Madison, opened the investigation on March 8, 2017.

87.     Upon information and belief, Defendant Madison met with Defendant Roe immediately after her initial email to Defendant Madison making the initial allegation that John had engaged in Prohibited Conduct.

88.     Upon information and belief, Defendant Roe was advised by Defendant Madison of her rights to interim measures including a no-contact directive.   Upon information and belief, Defendant Roe obtained interim measures in the form of reduction of academic and class attendance requirements.

89.     Upon information and belief, Defendant Roe did not request a no-contact directive as none was issued. Nor was any other protective order put in place such as an interim suspension. As noted above, Defendant Roe continued to interact with John by social media, continued to regularly visit John's fraternity, and volunteered to work evening dress rehearsals and performances at the theater for the production in which John had a lead role.

90.     John's initial contact with the investigation began on March 14th with the initial email as discussed above.

91.    Dependent Smith's first blatant violation of the Policy was her failure to give John "a concise summary of the conduct at issue" as required by Section X. Title IX Investigation and Resolution Process.

92.    The initial email stated only that the alleged conduct could be deemed Prohibited Conduct, under the policy, specifically rape, sexual battery, sexual harrasment, or non-consensual sexual contact. It did not state the specific conduct at issue nor give a summary of the conduct at issue.

93.    The initial email also summoned John to the Title IX administrative offices to meet with Defendant Smith and the other administrator to "review the complaint," but no complaint was produced and no oral description of the complaint was stated.

94.    At no time during the initial interview did Defendant Smith or Wippich state or summarize any conduct which John was alleged to have engaged in with Defendant Roe.

95.    At later meetings with Defendant Smith, John specifically asked what he was alleged to have done, and no answer was given.

96.    John's mother, acting as advisor in the Investigation[4], also asked for the concise summary of the conduct at issue. after several requests, Defendant Smith admitted that there was no such summary or a written complaint, despite the Policy's requirement that the administrators give such a concise summary of the conduct at issue to John.

[4] Defendant Smith informed John that he was not allowed to have an attorney. His mother, who acted as one of his advisors in the Investigation is an attorney. John wanted her to represent him and act as his advocate a result of his learning disability which prevents him from self-advocating, especially when under extreme duress.

25

97.      As a result of Defendant Smith's  failure and refusal to give John a concise

summary of the conduct at issue, he was was forced to assume what the conduct at issue was and

was therefore unable to prepare a thorough and appropriate defense against the actual allegation.

98.      The Title IX administrators also failed to conduct a fair, impartial and thorough

investigation in that they discriminated against John based on his learning disability.

99.      Defendant Smith was aware at the time of the initial interview that John had a

severe learning disability and was additionally suffering from a broken vertebrae.

100.     Upon information and belief, neither Defendant Smith nor the other administrator

contacted the University's Disability Services before or after the initial interview to familiarize

themselves with the appropriate protections and accommodations that would need to be made to

interview  a student with a severe expressive and receptive language disorder.

101.     At no time before during or after the initial interview throughout the investigation

did defendant Smith nor any other of the University defendants adequately engage John in a

deliberative, interactive process for determining what modifications were necessary for his

effective participation in the initial interview and the investigation as a whole. [5]

---

[5] After several months of having his disability completely dismissed (except for academic type
accommodates like extra time and a laptop to review documents), John pointed out this failure of the Title
IX administrators in his appeal and noted that a qualified and trained Disability Services person could
have directed them to a number of best practices for working with disabled students who have a severe
language disorder such as John's learning disability and are unable to self-advocate. Those measures
include giving great detail and context and summarizing if necessary when discussing new and complex
information, removing all ambiguity in oral and written communications, explaining technical terms as they
arise, dealing with issues in chronological order as far as possible,  actively encouraging the individual  to
ask questions to be repeated or rephrased without Center or implied criticism and to check understanding
by rephrasing questions and the  disabled student's answers,  inserting pauses when discussing
information as the subject matter changes in order to make sure the information is being absorbed,
making allowances for slow processing of information, misunderstandings and partial answers, allowing
thinking time before prompting a response, checking back as necessary to ensure understanding, being
aware that accurate and consistent recall details will not always be possible especially under extreme
pressure and anxiety, allowing students to draw diagrams or show movements rather than using words,
and offering brakes to restore concentration. As evidenced by the audio recording of John's March 15th
initial interview and the summary of it prepared by the administrators none of those actions were taken.

102.    The University had knowledge of John's severe learning disability long before he is matriculated at the University  as his decision among the final four potential schools was based in large part of 1 interviews John  and his family had conducted with the disability services  at the University.

103.    Likewise, after matriculating at the University, John specifically made notice of his severe learning disabilities and obtained specific academic accommodations that would apply in his everyday tenure at the University such as, additional time on testing and papers, the use and provision of books and other written documents in audio form, the right to have a note taker, etc.

104.    John did agree that if he needed to take advantage of any of those academic accommodations that he would request them.

105.    John did not, however, agree that he would have to request protection under the ADA or Section 504 in a disciplinary or sexual misconduct or other investigation conducted by the University without an advocate.  It is clear, that his severe learning disability would have prevented him from self-advocating under this stressful immediate summons that he received from defendant and attorney Smith to come in to the Title IX office in less than 24 hours.

106.    Under OCR guidance obtained under the Freedom of Information Act, in a setting such as this investigation and the initial interview, it is the obligation of the University and the other university defendants to "adequately engage [John] in a deliberate, interactive process for determining what modifications were necessary for his effective participation in the [investigation]."

107.    The policy as administered by the Title IX administrators allows the accused student to have an advisor but not an attorney or other advocate.

108.    The Title IX  administrators made it clear throughout the investigative process of they would not and could not respond to questions or other inquiries made by John's mother and advisor and insisted that Communications come directly from John.

109.    At the time the investigation was being conducted, John was a full-time student at the University, involved in a major theatrical production that required numerous hours of personal and group rehearsal, as well as other academic and extracurricular activities.

110.    Because of John's learning disability, it takes him much longer to absorb information and to prepare for his academics and his theatrical obligations.

111.    Defended Smith did not encourage or remind John that he was entitled to an advisor except in the initial email which noted that he could have one and then a list of "qualified" University advisor's was available.

112.    John was not told of the grave implications of proceeding without an advisor. Because he knew he had done nothing wrong and the sexual encounter was mutual, that he simply needed to tell his side of the story and it would be clear that he did not engage in any prohibited contact.

113.    Even if John had been advised or encouraged to get an advisor, the policy prohibits him having someone advocate on his behalf despite his learning disability.

114.    At the conclusion of the initial interview, Defendant Smith told John that there would be no need for witnesses because he had confessed.  John knew Defendant Roe had consented by her very active participation, and he believed at that moment that he made a

mistake in agreeing that Defendant Roe had not consented to sexual <u>contact</u>. He was completely unaware that Defendant Smith and Wippich understood him to have confessed to non-consensual sexual intercourse, in other words, rape.

115.    Although John believed he was likely to receive a minor sanction for non-consensual sexual contact, he was uncomfortable that he had agreed to Defendant Smith's question and for the first time informed his mother about the Title IX investigation and sought her advice.

116.    John's mother immediately began representing John as his attorney and attempted to do so in the investigation. As noted above, the policy does not allow attorneys so she was compelled to act simply as his advisor when dealing with the University in the investigation.

117.    As noted above,  John filed a grievance with Defendant Hill which was summarily denied based on the advice on the disabilities subject matter given by Defendant Smith (the perpetrator of the discrimination) to defendant Hill.

118.    While awaiting a decision on the grievance, John prepared written statement which is attached hereto, and notified the Title IX administrators of witnesses that he believed had direct knowledge of the events that night  as well as witnesses that could give other information based on their conversations with Defendant Roe

119.    The two witnesses with direct knowledge were (a) Witness RH who was with John at the party when Defendant Roe dragged him upstairs to go to bed, and (b) Witness L_, John's roommate who entered the room on the morning of January 21st and saw John  and Defendant Roe sleeping.

120.    Neither party was able to identify and other potential witnesses having direct knowledge or saw the parties together that morning before or after they had sex.

121.    During the appeal portion of this investigation, John learned that prior to Witness LB's giving a statement to the Title XI administrators, Defendant Roe had talked to him and said she was not naming him as a witness and did not want him to give a statement. Witness LB submitted an affidavit to that effect as part of John's appeal, but that new evidence was deemed irrelevant to the decision by Defendant Hill as discussed further below.

122.    The final decision on the John's appeal acknowledges that the administrators were told he had dyslexia but failed to take that into consideration in that interview or thereafter accept to grant more time for some of the responses.  They showed a fundamental lack of understanding of the severity and manifestations of severe dyslexia, thereby basically coercing a confession of rape out of John in utter disregard for his rights.

123.    Beginning several days after the night in question, Defendant Roe, Witness RS, and Witness NB, began harassing John, all of which is discussed in great detail in John's April 28, 2017 written statement.

124.    The Policy states that a no contact "directive is issued when it is believed necessary to protect a person's safety and preserve a peaceful environment for all students to work, study and live on campus."

125.    John submitted a request for a no-contact directive (the "NCD") to stop the harassment so that he could concentrate on his studies and fulfill his obligations with the major theatrical production in which he was the major lead.  The request for the NCD is attached.

126.    The NCD was issued, and Defendant Smith was charged with coordinating the implementation of the NCD.  Oddly, Defendant Smith met first with Defendant Roe to determine how Defendant Roe would like to proceed under the NCD.

127.    Defendant Smith Then map with John and determined his movement and schedule. John requested the theater to be a safe place for him because he spent so much time there and it was such a major production and might affect his eventual career.

128.    Defendant Smith indicated that they would be difficult to prevent Defendant Roe from being at the theater as it was part of her work study. So accommodations were made  to limit the likelihood they would cross paths.

129.    As it turns out, John and Defendant Roe did cross paths on the production nights because Defendant Roe did not stay in the assigned space, instead moving to an area where John would be passing for costume changes.

130.    During the appeals process, John learned that Defendant Roe's work study schedule did not require that she be at the theater in the evenings at any time. He also learned that Defendant Smith was aware of that fact when she told John that it would be difficult to keep Defendant Roe from being at the theatre during rehearsals and performances.

131.    John obtained and submitted as part of his appeal an affidavit from the University professor in charge of Defendant Roe's work study that stated that the professor had informed Defendant Smith that Defendant Roe's work study obligations were in the mornings and evening participation was by volunteer only.

132.    Upon information and belief, Defendant Smith chose to allow Defendant Roe to be in the theatre because that was the alleged victim's choice, which defeated the purpose of the

NCD, showing that Defendant Smith had no concern for protecting John from the harassment he had been suffering.[6]

133.    When preparing the Case File Summary, the Title line administrators referred to the NCD as "mutual." John and his advisor pointed out that incorrect characterization. Defendant Smith refused to recharacterize it as John's NCD despite the fact that Defendant Roe had not accepted a no contact directive as in initial interim measure, had never requested a no contact directive, continued to visit John's fraternity and continued to like his social media posts and manipulated her work study professor in such a way as to get around the NCD to continue her stalking of John.

134.    When presented later to the person deciding the sanctions,  the NCD was still referred to as "mutual" no contact directive, leaving the interpretation open as to who requested it and why.  Upon information and belief, Defendant Hernandez understood the NCD to be in place to protect Defendant Roe.

135.    Upon Information and belief, Defendant Hernandez was not informed that John requested the NCD because of the harassment he had been suffering prior to the Investigation. Nor was she given a copy of the request for the NCD which would have shown her it was not put in place to protect Defendant Roe, but to protect John.

136.    Upon information and belief, Defendant Hernandez took into consideration that a no-contact directive was issued in determining that Defendant Roe needed to be protected from John by the harsh sanction of suspension for two years.

---

[6] Nor did Defendant Smith find it relevant in make the determination of responsibility that Defendant Roe went out of her way to volunteer in the evening productions and that she did not stay in the designated place thus violating the NCD.

32

137.    Defendant Smith continued in her failure to conduct a thorough and unbiased investigation by allowing witnesses to give open-ended statements without any firsthand knowledge of the events and without questioning where the information they obtained came from.

138.    Defendant Smith did not attempt to determine the veracity of Defendant Roe or any of her witnesses, letting each witness give an open ended statement, with little or no follow up questions, even in the face of clear inconsistencies.

139.    The Policy does not all the accused student to submit questions or cross-examine Defendant Roe or her witnesses.

140.    The only questioning done by the administrators occurred after the investigative period was over and the parties had read each other statements (at which time John finally learned of the actual allegations).

141.    After both parties had reviewed the case file and responded, rather than make a decision, Defendant Smith needed to obtain more information from Defendant Roe to address the inconsistencies and missing information in her statements.

142.    In violation of the policy, Defendant Smith re-opened the investigation and asked Defendant Roe a series of leading questions obviously designed to fill in the missing information.  Not surprising Defendant Roe answered the questions fully, albeit with additional inconsistencies and implausible answers, especially since she had the full benefit of reading the full case file including John's statements.

143.    So Defendant Roe was allowed to be fully familiar with John's defense when she was allowed to "clarify" her statements with the help of Defendant Smith.  John, however, was

not even provided a statement of the precise conduct he was alleged to have committed when he made his statements and response, even though he had an express to such a statement under the terms of the Policy.

144.    John was was determined to be responsible for rape, sexual battery, nonconsensual sexual contact, and sexual harassment and was sanctioned to two years' suspension. The findings of fact do not indicate that there was any coercion or force and states that there was an ambiguity as to whether there was consent, making it John's obligation to prove there was consent.

145.    "Even if Complainant participated in sexual activity as respondent described, her verbal assertions immediately prior to those actions would still create a level of ambiguity, and the conflict between any physical action she might have taken in her verbal communications would leave it unclear as to whether she was consenting." Determination of Responsibility.

146.    This interpretation of consent means that while a person can withdraw consent in the middle of a sexual encounter, you cannot under any circumstances give consent after any expression of hesitancy, no matter how enthusiastic and voluntary your participation might be. By definition you are not consenting. No person could ever be sure that after a mutually enthusiastic sexual encounter that was preceded by hesitancy, that the other party might then claim no consent was given.

147.    The policy is clear that consent can be given by verbal and nonverbal communication. There is nothing unclear about actively and enthusiastically participating in sex. There was no ambiguity.

148.    Disregarded exculpatory evidence citing their use of a trauma-informed approach. Copy from your email re same.it is appropriate and probably required to use a trauma-informed

34

approach (awareness of what trauma victims suffer) in dealing with alleged victims when they are making complaint, being questioned, etc.  It is appropriate to initial "believe" them, to take their statements as true, understanding that they may be experiencing the affects of trauma, it does **NOT** relieve the school of its obligation to then investigate to see if the allegations are **actually** true.

149.    To determine if trauma has actually happened (when so much time as passed and there is no physical evidence because there was no examination or pictures, etc.) can be done by conducting psychiatric or psychological examination by qualified expert or by testing the veracity of the complainant (e.g., by comparing early statements with statement made after the initial complaint (for instance, I didn't get dressed or leave when he got up to get condom because I thought he changed his mind -  does not comport with the I was frozen and couldn't do anything then conclusion she stated earlier).

150.    Her actions in staying in the room, remaining naked, cuddling, and sleeping next to accused is indicative of two possible situations:  possibly traumatized or possibly pleasant post-coital activity.  Need expert examination or other evidence to impute trauma if trauma is used as a vehicle for disregarding testimony that is damaging to the complainant.

151.    John appealed on July 7, 2017 on the following grounds:  (1) that the administrators discriminated against John and violated his rights under the ADA and Section 504, (2) the administrators failed to follow the University's policy by failing to thoroughly investigate and to refusing to give John a concise summary of the allegations so he could properly defend himself, (3) no evidence regarding false and misleading statements made by Roe to the administrators and other involved in the proceeding, (4) that the sanctions were inappropriate given the lack of findings regarding coercion or force and because John would be

studying India at a monetary for the Fall semester and Roe would be in Ireland for the Spring semester, and (5) that the Policy is inherently unfair and denies accused students any semblance of due process. See Appeal of [John Doe] attached hereto which sets out in more detail the grounds for the Appeal which are substantially the same as in this Complaint without the legal claims and requested relief.

152.   Policy provides a 3-day appeal period. John was granted 8 extra days to allow because of his learning disability. The Policy's prohibition on copying any evidence and its requirement that John sit with an administrator and take notes from the evidence made it extremely difficult to adequately prepare an appeal, but John did submit it with the extended time.

153.   The appeal was denied in a two paragraph letter sustaining the determination of responsibility in its entirety on Wednesday, August 9, 2017 at 1:37 pm, a month and two days after the appeal was filed on July 7, 2017. In an August 7, 2017 email to John regarding when he might have a decision, Defendant Hill stated it was very complicated and that there was a lot to get through. John understands that all too well. At least Defendant Hill had the advantage of being able to peruse the evidence at his leisure. Still it took him more than a month to respond.

154.   The policy requires that the appeal be sent to the non-appealing student. This is a stark divergence from the policy's prohibition on copying documents and maintaining confidentiality.

155.   The policy also provides that the appealing student shall have five days to respond to the appeal.

156.    Upon information and belief, defended Hill waited at least two weeks before sending the appeal to defendant Roe.

157.    Upon information and belief, Defendant Hill deliberately waited to send the appeal to Defendant Roe because she was on vacation and unable to respond, a courtesy which was denied John back in June when his mother and advisor was out of state  and he was forced to conduct the case File summary review without the aid of someone who understood his disability.

158.    upon information and belief, University also sent the appeal and other evidence in the case two unrelated third parties.

159.    John has been accepted to the Carleton College India study abroad program for the Fall 2017 semester.  The India program requires students to abstain from drinking, drugs, and sexual activity and requires meditation twice daily commencing at 5:30 am and requires community service such as cleaning communal areas and such.

160.    John has been awarded the prestigious Gilman Scholarship in connection with the Carleton Program.  the University has already paid a substantial amount of federal, state, and University financial aid to Carleton College on John's behalf (paid after the determination of responsibility was issued and before the appeal was decided).  The financial aid cannot be returned or transferred to another school and the Gilman Scholarship cannot be transferred to another program and cannot be postponed.  It is now impossible for John to obtain admittance to any school in order to participate in this once in a lifetime opportunity.

161.    The University's Study Abroad coordinator will have to notify both Carleton and Gilman of the determination on the appeal as soon as she receives official notice from Vice President Hill.  Once Carleton and Gilman are notified, there will be no way to undo the damage

done and John will have forever lost this opportunity based on unchallenged allegations and discriminatory action by the University.

162.    Defendant Roe told mutual acquaintances that she was upset that the two had engaged in sex, but did not accuse him of forcing himself on her or raping her. She repeatedly stated that she did not want to get John in trouble just that he learn his lesson. None of those statements made sense to John because the encounter was mutual, but he expressed regret that Defendant Roe was upset. Upon information and belief, she did tell non-mutual friends that she did not consent to having sex. Several of them, Witness RS and Witness NB, harassed him repeatedly saying consent is to important and you do not understand. Witness NB even threatened to have John removed from the fraternity and said if it were up to him, he would have him prosecuted to the fullest extent of the law.

### COUNT I
### (Discrimination Based on Disability in
### Violation of the ADA and Section 504)

163.    John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

164.    John is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2).

165.    The ADA and Section 504 and implementing regulations require entities such as the University to provide programs and services in an integrated setting and to make reasonable modifications in policies, practices, and procedures that deny equal access to individuals with disabilities.

166.    John has been denied the modifications in the University's discriminatory practices, namely its discriminatory and error-riddled investigation processes and failure to engage in an interactive and deliberative process with John to establish appropriate methods to accommodate John's disability.

167.    As a result of the University's denial of modifications to the investigation and hearing processes, the University violated the ADA and Section 504  by discriminating against John due to his disability.

168.    As a direct and proximate result of the University's unlawful discrimination, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II
### (Breach of Contract)

169.    The foregoing allegations are incorporated herein by reference.

170.    At all times relevant hereto, a contractual relationship exists between the University and John through the University's Policy.

171.    The University is required to act in accordance with the Policy in adjudicating reports of alleged sexual misconduct.

172.    For all the reasons set forth above, the University has materially breached its contracts with John by failing to comply with its obligations, standards, policies, and procedures set forth in the Policy in the course of the Title IX investigation against John, and by subjecting him to a blatantly arbitrary and capricious disciplinary proceeding and discriminatory practices.

173.    As a direct, proximate, and foreseeable consequence of the University's numerous material breaches, John's academic and career prospects, earning potential, and reputation have

been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

174.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT III**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

175.    The foregoing allegations are incorporated herein by reference.

176.    Based on the foregoing facts, the University breached and violated the covenant of good faith and fair dealing implied in its contracts with John by, inter alia, failing to provide John with a hearing before an impartial tribunal, and instead, subjecting him to an unfair, biased and non-thorough, arbitrary and capricious Title IX investigation.

177.    As a direct, proximate, and foreseeable consequence of these breaches, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

178.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT IV
### (Estoppel and Reliance)

179.    The foregoing allegations are incorporated herein by reference.

180.    The University's various standards, policies and procedures constitute representations and promises that the University expected or should have reasonably expected would induce action or forbearance by John.

181.    The University expected or should have expected John to accept the University's offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises, including that the University would provide John with a fundamentally fair investigation, should he be accused of a violation of the Policy.

182.    John relied to his detriment on the University's express and implied promises and representations.

183.    As a direct, proximate, and foreseeable consequence of the above-identified conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

184.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT V
### (Negligence)

185.    The foregoing allegations are incorporated herein by reference.

186.    The University owes duties of care to John. Such duties include, without limitation, a duty of reasonable care in investigating and adjudicating the charges against him and maintaining the confidentiality of the Title IX investigation.

187.    The University breached its duties of care owed to John.

188.    As a direct, proximate, and foreseeable consequence of the University's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

189.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT VI
### (Defamation – The University)

190.    The foregoing allegations are incorporated herein by reference.

191.    The University has aided and abetted Defendant Roe in defaming John, allowing Defendant Roe to publish statements concerning John to third parties, both orally and in writing, which the University knows are false and malicious.

192.    Upon information and belief, the University has independently defamed John by deliberately, recklessly, or negligently disseminating confidential information from the investigation to third parties outside of the University's inner circle of administrators with a need to know.

193.    Upon information and belief, University administrators knew that findings in the DOR and DOS could not be squared with the evidence, defied common sense, and were arbitrary and capricious, and knew that Defendant Roe's initial allegations, and subsequent statements against John, were unreliable. Nevertheless, the University permitted the confidential information to be leaked to third parties.

194.    The University's conduct in defaming John and in aiding and abetting Defendant Roe's defamatory conduct was done with negligent, reckless, and/or intentional disregard as to their falsity.

195.    The University's conduct has harmed John's reputation in the community, leading directly to the loss of prospective employment opportunities, and loss of educational and professional opportunities and prospects.

196.    As a direct, proximate, and foreseeable consequence of the University's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to reputation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

197.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT VII
### (Defamation – Defendant Roe)

198.    The foregoing allegations are incorporated herein by reference.

199.    Defendant Roe made her false allegations to third parties not connected with the Title IX investigation.

200.    As a direct, proximate, and foreseeable consequence of the University's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to reputation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

201.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT VIII
### (Intentional Infliction of Emotional Distress:
### University, Defendant Smith and Defendant Hill)

202.    The foregoing allegations are incorporated herein by reference.

203.    The actions of the University, Defendant Smith and Defendant Hill were willful and intentional.

204.    The University, Defendant Smith and Defendant Hill knew or should have known that their actions in finding John responsible for Defendant Roe's frivolous charges, in repeatedly

44

discriminating against him on the basis of his disability, in conducting a fundamentally flawed disciplinary process, and in sanctioning John by effectively labeling him as a predatory sexual offender would cause John severe emotional distress.

205.    The conduct of the University, Defendant Smith and Defendant Hill was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

206.    The conduct of the University, Defendant Smith and Defendant Hill was the direct and proximate cause of John's severe emotional distress. He is deeply depressed and anxious; has frequent nightmares when sleeping; and the emotional distress has severely exacerbated his back injury.

207.    As a direct, proximate, and foreseeable consequence of the aforementioned conduct of the University, Defendant Smith and Defendant Hill, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

208.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

### COUNT IX
### (Negligent Infliction of Emotional Distress:
### The University, Defendant Smith and Defendant Hill)

209.    The foregoing allegations are incorporated herein by reference.

210. When the University, Defendant Smith and Defendant Hill undertake to investigate allegations of sexual and other misconduct against one of its students, they owe that student a duty to protect him from foreseeable harm.

211. By participating in the Title IX Investigation, under protest, John reasonably relied upon the duty of the University, Defendant Smith and Defendant Hill to protect him from harm.

212. For all the reasons set forth above, the University, Defendant Smith and Defendant Hill breached their duties of reasonable care.

213. As a result, John has suffered physical harm, including severe emotional distress. He is deeply depressed and anxious; has frequent nightmares when sleeping; and the undue stress has severely exacerbated his back injury.

214. Any reasonable person would have suffered severe emotional distress under the same or similar circumstances.

215. As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT X
### (Declaratory Judgment)

216. The foregoing allegations are incorporated herein by reference.

217. The University has committed numerous violations of it contractual obligations and of federal and state law.

218. John's educational and career opportunities have been severely damaged. Without appropriate redress, the unfair outcome to the University's deeply flawed process will continue to

label John as a predatory sexual offender, greatly jeopardizing his prospects for gaining entrance into any other school and future employment, with no end in sight.

219.    As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handling of John's education record at the University.

220.    By reason of the foregoing, pursuant to 28 U.S.C. § 2201, John requests a declaration that: (a) the findings and sanction against John made by the University pursuant to the Title IX investigation be reversed; (b) John's disciplinary record pursuant to the Title IX investigation be expunged and removed from his education record at the University; (c) the University provide John with a notarized letter confirming that the findings and sanction have been reversed and expunged from John's education record; (d) the University shall restore John's reputation to third parties to whom the University has failed to adequately safeguard the findings of the Title IX investigation.

### COUNT XI
### (Intentional Infliction of Emotional Distress - Defendant Roe)

221.    The foregoing allegations are incorporated herein by reference.

222.    The actions of Defendant Roe in making the false accusations to third parties in order to manipulate them into bearing false witness and misleading University personnel regarding her work-study obligations so she could manipulate the no contact directive to allow her to be at John's important theater production in an attempt to intimidate him were willful and intentional.

223.    Defendant Roe knew or should have known that her untrue charges leading to the University's effectively labeling him as a predatory sexual offender and her presence at John's theater production would cause John severe emotional distress.

224.    The conduct of Defendant Roe was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

225.    The conduct of was a direct and proximate cause of John's severe emotional distress. He is deeply depressed and anxious; he is no longer able to sleep through the night; and the emotional distress has severely exacerbated his back injury.

226.    As a direct, proximate, and foreseeable consequence of the aforementioned conduct of Defendant Roe, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

227.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**PRAYER FOR RELIEF WHEREFORE,** Plaintiff John Doe, respectfully requests that this Honorable Court: (a) Order the University to reverse and expunge its findings of responsibility and sanction from John's education record, and to publicly state that the University has reversed and expunged the findings and sanction; (b) Order the University to verify this reversal and expungement of John's education record by providing John with a notarized letter

confirming that the findings and sanction have been reversed and expunged from John's education record; (c) Award John compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages; (d) Award prejudgment interest; (e) Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) (relating to Title IX), or pursuant to other statute or common law doctrine providing for such award; and (f) Grant such other and further relief that the Court deems just and proper in the circumstances.

Respectfully submitted,

Bridget Farren                      (#19208-73)
648A Lakeview Drive
Zionsville, IN 46077
Telephone: (317) 517-5155
Email: bridget@farrenres.com

*Attorney for Plaintiff*

## VERIFICATION

I, John Doe, affirm under penalties for perjury that the foregoing statements are true to the best of my knowledge and belief.

Date:_____          _____

                                              John Doe